IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| SPARTAN SPECIALTY FINANCE I, SPV, LLC | Case No 16-22881 (RDD) |
| Debtor. | Re: ECF No. 8 |

**OBJECTION OF HAMILTON FUNDING 1 LP TO
DEBTOR'S APPLICATION FOR ENTRY OF ORDER (A) AUTHORIZING
DEBTOR'S INTERIM USE OF CASH COLLATERAL, (B) GRANTING
ADEQUATE PROTECTION TO LENDER, (C) SCHEDULING FINAL HEARING
PURSUANT TO BANKRUPTCY RULE 4001, AND (D) FOR RELATED RELIEF**

Hamilton Funding 1 L.P. (the "Lender") hereby objects to the motion of Spartan Specialty Finance I, SPV, LLC (the "Debtor") for entry of an order authorizing the use of the Lender's cash collateral (the "Cash Collateral Motion") [ECF No. 8],[1] and in support thereof respectfully represents as follows:

**Objection**

1. <u>The Court should deny the Cash Collateral Motion in its entirety</u>. Sections 363(c) and (e) of the Bankruptcy Code expressly prohibit a debtor from using cash collateral without the consent of the secured creditor or an order of the Court. Where a creditor does not consent, the Court must determine that the creditor is adequately protected. *See* Bankruptcy Code §§ 363(c)(2)(B), (c)(3), and (e). A secured creditor is entitled to adequate protection as a matter of right, not merely as a matter of discretion, when the entity is stayed from enforcing its interest,

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Cash Collateral Motion.

and when the estate proposes to use, sell, or lease property in which the entity has an interest. **The Debtor is a mere holding company – an investment vehicle with no business to protect and no assets other than nominal ownership of underperforming loans (nearly half of which are delinquent) – that will all expire within a matter of months, leaving the Debtor with nothing to repay its secured lender.** The Debtor has plainly failed to satisfy its burden of demonstrating that use of cash collateral is necessary or appropriate, nor has the Debtor shown that it will be able to provide adequate protection to the Lender in accordance with the Bankruptcy Code.

2. <u>In the alternative, the Court should deny the Debtor's motion for an order shortening time for the hearing on the Cash Collateral Motion</u> [ECF No. 10]. That relief has not been granted, and a hearing on that motion has been calendared concurrently with the hearing on the merits of the Cash Collateral Motion. The Debtor commenced this chapter 11 case on June 29, 2016, and <u>has made no efforts (prepetition or postpetition) to approach the Lender or otherwise engage with the Lender</u> regarding the Cash Collateral Motion and this chapter 11 case. In fact, the Lender has not yet received any notice of the filing of the Cash Collateral Motion, and only came across the motion (and the request for Bankruptcy Rule 2004 examinations) when counsel was consulted and the undersigned reviewed the public docket in this case. The Lender has had less than two days to consider the requested relief and to prepare this objection (the "<u>Objection</u>"), and the Debtor's contested use of the Lender's collateral cannot be granted on such short notice.

I. **The Debtor's Proposed Adequate Protection Is Inadequate**

3. By the Motion, the Debtor seeks to use the Lender's own money to pursue a witch hunt against the Lender itself. The Debtor's refusal to engage the Lender either on a prepetition or postpetition basis, or to negotiate regarding a consensual form of cash collateral order (or

- 2 -

75703309.3

some other efficient resolution of this case), simply affirms the Debtor's attempts to force the Lender to pay for an unfounded fishing expedition, in the hopes of extracting value for the Debtor's insiders and equity investors.

4. Indeed, there is no business to protect. The Debtor is simply a holding company, and the only beneficiaries of the use of the Lender's cash collateral are the Debtor's insiders and professionals. Notwithstanding its repeated references to "servicing" activities (*e.g.*, Cash Collateral Motion at ¶¶ 8, 36, 38, 41, 45), the Debtor does <u>nothing</u> to service or otherwise manage the Portfolio. The Lender is more than capable of continuing to manage the loans and to continue working with Argon, as servicer of the loans. In fact, it is the Lender that generates all necessary models and performs the requisite analysis for the management of the loans. The Debtor brings no added value to the investments that it holds, and the Lender's cash collateral would only result in unnecessary (and unrecoupable) payments to the Debtor's insiders and professionals, as well as the minimal "ordinary business expenses" – which, as the Debtor notes (because it must), aggregate to no more than $500 a week in "miscellaneous" expenses of a holding company with no meaningful operations.[2]

5. At the same time, the Debtor's assets, including those in which the Lender has an undisputed security interest, continue to waste away. The Debtor is indebted to the Lender in the amount of **$3,045,621.19 (exclusive of legal fees)**. By the Debtor's own admission, the loans in the Portfolio "consists principally of small (under $10,000) unsecured loans that provide capital to borrowers with sub-par credit who would otherwise be foreclosed from the lending marketplace." Cash Collateral Motion at ¶ 8. Those loans are, for the most part, "for

---

[2] As discussed below, the approximately $30,000 per month that the Debtor proposes to pay to the Servicer is not a servicing fee, but an acquisition fee which is not a necessary operating expense on a going-forward basis, and in no case should such amounts be withdrawn from the Lender's collateral and is clearly subordinate to the Lender's secured debt pursuant to the LSA.

- 3 -

terms of less than 36 months." *Id*. at ¶ 9. In fact, the Lender's records reflect a weighted average of just **22 months** remaining in the life of the loans in the Portfolio, after which the Debtor will have no source of funds or assets with which to pay its secured lender.

6. The Debtor's suggestion that it continues to be "cash flow positive" is, therefore, entirely misguided and ignores the fundamental nature of the loans in the Portfolio, as well as the very nature of the Debtor's business. Even if the Debtor's proposed budget is correct and the Debtor will throw off some cash on a month-to-month basis, such cash must be used to pay down the millions of dollars owed to the Lender, as the loans in the Portfolio will, over the coming months, continue to wind down and cease generating any revenues whatsoever. Even if the Debtor is correct that the coming weeks will bring $200,000 in revenues per month (of which the Lender is highly doubtful), it will take more than thirty months to repay the amounts owed under the LSA (not including legal fees and other expenses attendant to this chapter 11 case and surprise motion for use of cash collateral). By that time, most of the loans in the Portfolio will have dissipated in their entirety, and in the meantime, the Debtor's monthly revenues will rapidly decline as the loans continue to wind down in the coming weeks and months.

7. Moreover, 48% of the "marketplace loans" in the Portfolio are delinquent, and those rates continue to rise. It is incredibly shortsighted (and disingenuous) to suggest that positive cash flows in the coming month or two will yield an equity cushion for the Lender's protection. The Lender is far from oversecured. Instead, it seems that this case may even be administratively insolvent, once the steady depletion of the loans in the Portfolio is taken into

- 4 -

account.[3]  Put simply, (i) the Debtor has just $1.9 million in non-delinquent collateral; (ii) the loans in the Portfolio will continue to wind down in the coming months, with no replacement loans and no other source of revenue; and (iii) the Lender is owed over $3 million.

8. The proposed adequate protection payments also omit any reference to payment of the Lender's legal expenses, as is its right pursuant to section 9.18 of the LSA.  Even if the Debtor were in a position to provide adequate protection payments, those payments must include those payments, in accordance with the LSA itself.

9. To make matters worse, the Debtor proposes to make any adequate protection payment contingent on the release by the Lender of the cash that was swept pursuant to the DACA <u>prior to the commencement of this chapter 11 case</u>.  It is not only the Lender's cash collateral that the Debtor is seeking to use; the Debtor is requesting that this Court effectively require the Lender to infuse its cash, held in its own accounts, into the Debtor's coffers, as a condition precedent to receiving any "adequate protection" in this case.

10. Still further, the Debtor proposes to provide adequate protection in the form of replacement liens, but the Lender already has a replacement lien on all of the Debtor's assets, including those "hereafter acquired," including all Receivables and Collections and "all supporting obligations and all present and future liens, security interests, rights, remedies, title and interest in, to and in respect of Receivables and other Collateral. . . ."  *See* LSA at § 5.1.  "Replacement liens" that are already collateral is not adequate protection.  *See, e.g., In re Buttermilk Towne Center, LLC*, 442 B.R. 558, 566 (6th Cir. B.A.P. 2010) ("Therefore, this court cannot accept that the use of future rents to replace the expenditure of the prior months rents somehow provides adequate protection for the secured party.").

---

[3] Because of the short duration of the loans in the Portfolio and the high delinquency rates of such loans, any projections for the Debtor's actual revenues from such loans must reflect the steady and inevitable erosion of the Debtor's only assets.

75703309.3

11. Consequently, any cash spent by the Debtor on, among other things, payments to insiders and to counsel that has not yet been retained, will directly and immediately come out of the Lender's pockets, with no prospect of repayment at a later date and no meaningful adequate protection. The Debtor has therefore failed to meet its burden of demonstrating that it should be permitted to use the Lender's cash collateral.

## II. The Debtor Defaulted on Its Obligations Under the LSA; It Has No One to Blame But Itself

12. The Debtor principally relies on unsupported arguments that it has claims against the Lender (among others) for fraud, breach of contract, fraud in the inducement, and more. Cash Collateral Motion at ¶ 34. But those allegations have no basis in law or fact. The Debtor's main challenge is that the Lender went "radio silent" when the Debtor (finally) sought to work out an alternative deal regarding the LSA. *Id.* at ¶ 27. But the Lender was under no obligation whatsoever to renegotiate the LSA, which was the product of fair, arm's length negotiations among sophisticated parties. And, in any case, it was the Debtor who repeatedly promised that it would comply with its obligations under the LSA, but consistently failed to deliver, notwithstanding the Lender's repeated efforts to work with the Debtor to work out its loan. Although the Lender was more than willing to negotiate, the Debtor refused (or was unable) to substantiate its offers with any cash whatsoever, held in escrow or otherwise.

13. Merely by way of example, Mr. Kostiner repeatedly assured the Lender that he would fund amounts due and owing or otherwise satisfy the Debtor's obligations under the LSA, but failed to do so in every instance. *See, e.g., See* Email from Barry Kostiner to Daniel Wirzberger, dated February 22, 2016, attached hereto as Exhibit A ("I take full responsibility for the lack of communication that has occurred, and has resulted in our current situation. … I am happy to personally work out a deal to provide whatever compensation you feel is

- 6 -

75703309.3

appropriate to make up for any losses that have resulted from my miscommunication. … I appreciate tremendously the relationship with you, and am eager to rectify any damage that I have caused.").[4]

14. Moreover, the Debtor has argued that it has the right to cure defaults under the LSA, insofar as it failed to replace Defaulted Receivables and failed to satisfy the Minimum Utilization Requirement under the LSA. A plain reading of the LSA demonstrates that such defaults were not subject to cure. For example, the Obligations under the LSA were automatically and immediately due and payable upon default, pursuant to Section 10.2(b) of the LSA. Moreover, and perhaps even more clearly, the LSA itself provides that the Lender was only obligated to lend to the Debtor for ninety (90) days after the Closing Date of November 24, 2015 – *i.e.*, until February 22, 2016. If the defaults pursuant to the LSA were subject to cure, such cure right would, effectively, provide the Debtor with a right to unilaterally extend the Drawdown Termination Date (as such term is defined in the LSA), simply by arguing that it has a "right to cure" any defaults existing as of that date; this is plainly inconsistent with any credible reading of the LSA.

15. This chapter 11 case is plainly being run solely for the benefit of the Debtor's insiders and equity investors. Undisputed non-insider unsecured claims aggregate to less than $230,000, nearly $190,000 of which is on account of a loan that appears to have been incurred

---

[4] *See also* Email from Barry Kostiner, dated Jan. 8, 2016, attached hereto as Exhibit B ("No. I am hoping we can complete this [$2mm in funding] on January 21st when I am back in Chicago."); Email from Barry Kostiner, dated Jan. 26, 2016, attached hereto as Exhibit C ("I am meeting with our mezzanine investor tomorrow, and expect to go for the next draw on Monday, although as a result of the loan availability, it will be much smaller than expected."); Email from Barry Kostiner, dated Feb. 5, 2016, attached hereto as Exhibit D ("Argon is expecting to receive $5 mm from its investors this week, which will enable it to buy all the loans we need this month, as well as provide the remaining 30% advance on our senior line of credit with you, if needed. … [I]if needed, we will be able to draw whatever equity is required from Argon to complete a $7 mm draw on the Hamilton line by the end of February."); *id*. (prior email from Barry Kostiner, at 11:23 AM the same day, noting that "[w]e do not yet have the money in the account. I am hoping to get it in on Monday so we can fund on Tuesday."); Email from Barry Kostiner, dated Feb. 9, 2016, attached hereto as Exhibit E ("I had a positive meeting with Jacob Sod this morning. I expect that he will fund $500k this week, followed by the remainder from my other investors this month. … I apologize for the delay.").

- 7 -

75703309.3

in violation of section 9.9 of the LSA, which prohibits the incurrence of indebtedness without the Lender's approval.[5]  The Debtor's proposed Budget proposes to spend <u>more than half that amount</u> on payments to the Debtor's Manager and to the yet-to-be-retained professionals, in just the next twelve weeks.  *See* Budget, annexed to the Cash Collateral Motion.  Moreover, the $30,000 per month that the Debtor proposes to pay to the Servicer (*id*.) is not a servicing fee, but an acquisition fee that is specifically subordinate to the secured debt, and which is neither necessary to the ongoing servicing of the loans in the Portfolio nor an "ordinary operating expense."  If, on the other hand, the Debtor's equity investors truly believe that the Debtor has supportable claims against the Lender (which it does not), it should be their money that is spent pursuing such claims, which will inure directly to their benefit.

16. The Debtor has failed to show that it made any attempts whatsoever to locate postpetition financing from any other source, or to negotiate with the Lender regarding this chapter 11 case.  These litigation tactics are not surprising, given the Debtor's continuing willingness to blame everyone but itself and its management for its failure to raise sufficient capital or to service its secured debt.[6]

17. In fact, the Debtor continually and repeatedly represented that it would fund the amounts due to the Lender, while failing to do so at every juncture.  The Debtor's principal even went so far as to state that he took "full responsibility for the lack of communication that has occurred, and has resulted in our current situation" (*i.e.*, the default).  *See* email from Barry

---

[5] The remaining $100,000 is comprised of $25,000 in disputed legal fees and $75,000 in "Management Fees" due to FinTech Asset Management, an insider of the Debtor – and also managed by the Debtor's principal, Barry Kostiner.

[6] Amounts due to the law firm that represented the Debtor in connection with the LSA are also "disputed" in the Debtor's petition; the Debtor may yet seek to assert claims against its own law firm in connection with the negotiation, execution, and enforcement of the LSA.

- 8 -

75703309.3

Kostiner to Daniel Wirzberger, dated February 22, 2016, attached hereto as <u>Exhibit A</u>. Mr. Kostiner further noted:

> There is a lot of money involved in this transaction, both your investors and my investors, and I cannot afford to have this transaction go into default.
> I am happy to personally work out a deal to provide whatever compensation you feel is appropriate to make up for any losses that have resulted from my miscommunication.
> …
> In the future, I will communicate with you the status of my investors up front, and would not want you to draw funds from your investors until after you see what has been actually funded.
> …
> I appreciate tremendously the relationship with you, and am eager to rectify any damage that I have caused. It would mean a lot to me if any penalties you require come out of my personal interest in the deal, while keeping the transaction in good standing and not jeopardizing my relationship with my investors.

*Id*.

### III.  Recoveries, if any, Should Be Sought From the Debtor's Principal

18. As noted above, Mr. Kostiner has a great "personal interest" in this deal, and cares more about his personal relationship with his investors than he does about the Debtor. If the equity investors wound up losing money, they should look to Mr. Kostiner and the Debtor, and not to the Lender, which executed an arm's length secured loan agreement with the Debtor and is entitled to the protections and remedies set forth therein.

### IV.  The Debtor Should Not Be Authorized to Pay Legal Counsel Without Court Approval

19. As part of the proposed Budget, the Debtor proposes to pay more than $25,000 a month to the Debtor's "Professionals" and "Litigation Expenses" and $2,500 a week to Mr. Kostiner himself.

20.  Section 327 of the Bankruptcy Code permits the Debtor, with the court's approval, to employ attorneys to represent or assist the Debtor in carrying out the Debtor's chapter 11 duties. The Debtor has not yet filed any motion to retain counsel in this case. Once

any professionals are employed, such professionals must seek approval for interim compensation during the administration of the case, and final compensation at the conclusion of the case, as permitted by sections 328(a), 330, and 331 of the Bankruptcy Code, Federal Rule of Bankruptcy Procedure 2016, and all applicable local rules and guidelines.  The Debtor should not be allowed to circumvent the requirements of the Bankruptcy Code and pay fees to legal counsel (or to insiders) – principally to fund litigation against the Lender – without first seeking and obtaining proper approval of the Court after notice and a hearing.

### V. Limitations on Use of Cash Collateral

21. Even if the Court authorizes the use of cash collateral, which it should not, the Lender notes that the Debtor's proposed conditions for the use of Cash Collateral are overbroad and unwarranted.  For example, no cash collateral should be used for any purpose other than court fees and whatever necessary operating expenses can be substantiated. The Lender's cash should **not** be used to pay acquisition fees, payments to insiders, legal fees to counsel that has not yet been retained but will principally devote time and expense to suing the Lender.

22. Any Cash Collateral Order should also delineate the events of default that would give rise to the Lender's remedies, together with the nature of those remedies (for example, automatic relief from the stay to foreclose on collateral).  Absent such provisions, the Lender's protections, such as they are, are rendered even more meaningless.

23. Moreover, the proposed Cash Collateral Order does not set a definitive end date for the use of the Lender's cash collateral, and would remain effective until entry of a Final Order.  The Debtor has not demonstrated that the inability to immediately use cash collateral will cause irreparable harm to the Debtor, as there is virtually nothing to preserve (other than the loans in the Portfolio, which effectively belong to the Lender).  In any case, any relief

should be limited to the absolute minimum time necessary to adequately assess this chapter 11 case and to properly brief this issue.

### VI. Reservation of Rights

24. As noted above, the Lender has had less than two days to respond to the Cash Collateral Motion. The relief sought therein should be denied in its entirety. But the Lender reserves the right to (i) supplement this Objection as necessary, including with respect to additional protections that may be necessary in the event that the Debtor is permitted to use any of the Lender's cash collateral and/or (ii) move this Court for appropriate relief, including relief from the automatic stay or to convert or dismiss this chapter 11 case.

### CONCLUSION

25. The Debtor has no meaningful business to speak of; it is solely an investment vehicle and does virtually nothing to manage, service, or otherwise engage with the loans in the Portfolio. Any amounts spent by the Debtor will come directly out of the Lender's pocket, with no chance of ever being paid amounts due to it pursuant to the LSA, and no benefit whatsoever to the estate. The loans in the Portfolio are rapidly dwindling, and there is no prospect of repayment of the secured debt owed to the Lender. The Debtor has failed to prove the existence of an equity cushion to adequately protect the Lender, which will be irreparably harmed by the Debtor's use of its cash collateral for no credible or rational reason.

26. The Debtor has also failed to prove that the Lender would be adequately protected by a replacement lien on cash collateral in which the Lender already has a lien and by payments of interest when due, to be paid effectively out of the cash that the Lender properly swept prior to the commencement of this chapter 11 case. The Court, therefore, cannot authorize the use of the Lender's cash collateral.

75703309.3

Dated: July 7, 2016

        By:
        */s/ H. Jeffrey Schwartz*
        **ROBINS KAPLAN LLP**
        H. Jeffrey Schwartz
        jschwartz@robinskaplan.com
        Craig Weiner
        cweiner@robinskaplan.com
        Doron P. Kenter
        dkenter@robinskaplan.com
        601 Lexington Avenue, Suite 3400
        New York, NY 10022-4611
        Telephone: (212) 980-7400
        Fax: (212) 980-7499

        *Attorneys for Hamilton Funding 1 LP*

75703309.3

- 13 -

75703309.3