**ROBINSON BROG LEINWAND GREENE
GENOVESE & GLUCK P.C.**
875 Third Avenue
New York, New York 10022
A. Mitchell Greene
*Proposed Finance/Litigation Counsel for the
Debtor and Debtor in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X

| | |
|---|---|
| In re: | Chapter 11 |
| **SPARTAN SPECIALTY FINANCE I SPV, LLC,** | Case No: 16-22881 (RDD) |
| Debtor. | |

----------------------------------------------------------X

## DECLARATION OF BARRY J. KOSTINER

**Barry J. Kostiner,** under penalty of perjury, declares pursuant to the provisions of 28 U.S.C. §1746 as follows:

1. The undersigned is over the age of 18 and is competent to deliver this Declaration.

2. The undersigned is the sole member of Fintech Asset Management, LLC ("Fintech").

3. Fintech is the sole member of Spartan Specialty Finance I, LLC ("Spartan").

4. I offer this declaration to correct numerous inaccuracies contained in the Objection to Motion for Cash Collateral filed by Hamilton Funding I, LP ("Hamilton").

The Value of the Portfolio

5. Contrary to the claims by Hamilton, the value of Spartan's loan portfolio (the "Portfolio") is considerably higher than the sums that Hamilton claims is due to it from Spartan.[1]

---

[1] Spartan aggressively disputes the sums claimed by Hamilton and intends to prove as part of its Chapter 11 case that the true amount due to Hamilton is far less than is claimed.

{00800956.DOC;1 }800076-2

6. As of July 6, 2016, according to the independent reports provided by the servicer of the Portfolio, the Portfolio is comprised of 921 outstanding, performing loans with a total receivable due of $4,953,281 (the "Receivable").

7. The terminology used to describe the Portfolio is very important. Under the terms of the Credit Agreement between Hamilton and Spartan, a loan is performing if it is not in default. The definition of a defaulted loan in the Credit Agreement is any loan for which a payment has not been made in over 90 days.

8. In Hamilton's opposition papers, they refer to an exorbitant default rate associated with loans that are "delinquent" (¶7, Hamilton Opposition to Cash Collateral). However, Hamilton offers no explanation for what constitutes a "delinquent" loan.

9. It must be recalled that the Portfolio is comprised of a wide array of loans, offered to "near prime" borrowers at relatively high interest rates.

10. While it is fair to assume that the Portfolio would suffer from high levels of default, the default levels claimed by Hamilton are simply unrealistic and are not in compliance with the very terms set forth in the Credit Agreement.

11. If one were to assume a default rate for the Portfolio of 30% going forward, the value of the Receivable – adjusted for the assumed default rate – would be $3,467,297. This amount is far in excess of the net outstanding amount claimed due by Hamilton.

12. This is not the end of the analysis. In addition to the Receivable, there are loans that were transferred to a Collections Account (the "Collections Loans").

13. The Collections Loans represent loans that are not performing. The principal balance due under the Collections Loans – as of July 6, 2016 – is approximately $998,000.

14. It is fair to assume that some portion of the Collections Loans will be recovered through Collections Activities.

15. Therefore, the value of the Portfolio is really the sum of the default adjusted Receivable plus some assumption for collection on account of the Collection Loans.

16. As such, Hamilton is over-collateralized.

Servicing

17. Hamilton also objects to the use of cash collateral to service the Portfolio.

18. The servicing function is critical to the proper collection of funds due under the loans in the Portfolio. Absent a proper and aggressive servicing function, the value of the Portfolio will suffer.

19. The current servicer of the Portfolio is Argon Credit, LLC ("Argon").

20. Argon is supposed to be paid for its servicing services pursuant to a Servicing Agreement between Argon, Spartan and Fintech.

21. The funds available to pay Argon are provided for in the Credit Agreement.

22. Contrary to Hamilton's claims, the funds that are provided in the Cash Collateral Budget are for Servicing Expenses – not "acquisition" costs.

23. It should be further noted that since the date that Hamilton declared Spartan to be in default, Hamilton has not made a single payment on account of Servicing Fees to Argon (see declaration of Harry Madanyan).

24. Hamilton's complete disregard for its obligation to pay servicing expenses with respect to the Portfolio has exposed the Portfolio to anemic collection efforts.

25. This is another example of Hamilton's complete disregard for any financial interest other than its own.

26. It is imperative that the Portfolio receive proper servicing in order to maximize recovery for all of Spartan's creditors – not just Hamilton.

27. The servicing function requires sophisticated software and a team of professionals skilled in this area. These professionals come from not only Argon but from Spartan and Fintech as well.

28. Hamilton has no such software or professional team – despite their claim that they could service the Portfolio themselves.

29. Absent the ability to use Cash Collateral to pay the Servicer, it is unclear how the Portfolio will be serviced in light of Hamilton's refusal to pay for servicing fees for the past four months.

Emails

30. I feel that it is important to address the emails that Hamilton cites in its Opposition to the Cash Collateral.

31. These emails were "cherry picked" to present a rather disingenuous snapshot of the complex relationship between Hamilton and Spartan.

32. Contrary to Hamilton's claims that there was a lack of communication among the parties that led to the default, there was in fact significant communication between the parties.

33. It is this frequent communication that led me – and others – to rely on the assurances of Hamilton and its team as to waivers of time and other extensions under the Credit Agreement.

34. It will be these very communications that will be used in an Adversary Proceeding against Hamilton to establish Hamilton's "bad faith" and willful breach of the Credit Agreement to avoid honoring its obligations thereunder.

35. At no point did I ever acknowledge to Hamilton that there was any intention on the part of Spartan to default under the Credit Agreement.

36. Rather, I repeatedly advised Hamilton that Spartan had funds available to it to meet its obligations.

37. The need for a short extension of time under the Credit Agreement was to finalize the selection of loans that would be purchased.

38. Spartan is more than prepared to demonstrate the foregoing as part of its Adversary Proceeding and, as such litigation of these issues is premature for purposes of a Cash Collateral Hearing.

39. Nevertheless, I felt that it was important to provide the Court with a clear understanding as to the facts surrounding the value of the Portfolio, the importance of Portfolio servicing and the true nature of the communications between myself and representatives of Hamilton.

Role of Spartan & Fintech

40. While not directly related to the issue of Cash Collateral, I feel that it is important to also reply to Hamilton's spurious claim that the Debtor "does nothing to service or manage the Portfolio" (¶4 – Hamilton Opposition to Cash Collateral).

41. In fact, nothing could be further from the truth. Spartan and Fintech were active managers of the Portfolio and the servicing of same.

42. Fintech – on Spartan's behalf – employed analysts who performed rigorous analysis and stress testing of the Portfolio.  In addition, Fintech and Spartan worked closely with the Servicer to address the issue of defaulted loans and efforts that could be made to remedy same.

43. It was not until Hamilton improperly declared an event of default – and caused a complete collapse of Spartan's operations – did the default rate associated with the Portfolio start to rise.

44. Contrary to Hamilton's claims, it was Hamilton that was ill-equipped and unsuited for the analysis and management of the Portfolio.

45. Without Spartan's immediate ability to access Cash Collateral - and resume its analytical services and oversight with respect to the Portfolio – monetization of the Portfolio will continue to suffer at the expense of Spartan's other creditors.

**Executed this 8th day of July, 2016**

        **SPARTAN SPECIALTY FINANCE I, LLC**

        **By:  Fintech Asset Management, LLC,**
        **its Sole Member**

        **By:** _[signature]_
        **Barry J. Kostiner, Sole Member**