SILLS CUMMIS & GROSS, P.C.                    **Hearing Date: May 19, 2017 at 10:00 a.m.**
Valerie A. Hamilton, Esq.                     **Related Documents: 59, 60**
600 College Road East
Princeton, NJ 17110
Telephone: (609) 227-4600
Facsimile: (609) 227-4646
Email: vhamilton@sillscummis.com
Attorneys for Fund Recovery Services, LLC

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Hon. Robert D. Drain |
| SPARTAN SPECIALTY FINANCE I SPV, LLC, | Case No.  16-22881 (RDD) |
| Debtor. | Chapter 11 |

## OBJECTION OF FUND RECOVERY SERVICES, LLC TO (I) DEBTOR'S MOTION FOR APPROVAL OF STIPULATION AND AGREEMENT RESOLVING DEBTOR'S MOTION FOR USE OF CASH COLLATERAL AND FIXING AMOUNT OF SECURED CLAIM AND (II) DEBTOR'S MOTION TO DISMISS CHAPTER 11 CASE

Fund Recovery Services, LLC ("**FRS**"), as assignee of Princeton Alternative Income

Fund, LP, by and through its counsel, Sills Cummis & Gross, P.C., hereby objects to (i) the

motion of Spartan Specialty Finance I SPV, LLC ("**Spartan**" or the "**Debtor**") pursuant to Fed.

R. Bankr. P. 9019 to approve a stipulation and agreement resolving Debtor's motion for use of

cash collateral and fixing the amount of Hamilton Funding I, LP's ("**Hamilton**") secured claim

against the Debtor (the "**Settlement Motion**"), and (ii) the Debtor's motion pursuant to 11

U.S.C. §§ 105(a), 305(a) and 1112(b) to dismiss the Debtor's Chapter 11 bankruptcy case (the

"**Dismissal Motion,**" and together with the Settlement Motion, the "**Motions**"), and in support

thereof, states and represents as follows:

## PRELIMINARY STATEMENT

The proposed settlement of Hamilton's alleged secured claim and dismissal of the Debtor's bankruptcy case is nothing more than a strategic attempt by Hamilton to grab the money and run.  The Debtor's principal, Barry Kostiner, is willing to let that happen because he gets a release from his personal guaranty in exchange for the Debtor's complicity.  The funds that will pay the settlement are proceeds of FRS's collateral, and FRS has been trying to recover that collateral since the day that it learned that loans pledged to it were wrongfully transferred to the Debtor.

The loans originated with subsidiaries of Argon Credit, LLC, and they were pledged as collateral to FRS.  After a lengthy evidentiary hearing, Judge Deborah L. Thorne, who is presiding over Argon's bankruptcy case, made a written finding that "the funds from [Argon's] sale [of loans to Spartan] were not turned over to Princeton and although the sold loans continued to be listed on [Argon's] aging report, those sold loans were also the collateral of [Spartan] and certain insiders of the Debtors.  In effect, those sold loans were being 'double counted' as both collateral of [Spartan] and Princeton."  See Statement & Order Denying Use of Cash Collateral, fn.3, annexed as **Exhibit A** hereto.

As this Court is aware,[1] Hamilton and the Debtor have disputed FRS's interest in the loan portfolio and its proceeds.  One of the key purposes of the settlement is to deprive FRS of its day in court to prove its superior right to the loans and their proceed.  If the settlement is approved and the case dismissed, there will be no way for FRS to recover any money paid in derogation of FRS's superior rights, and FRS will be left without a remedy.

---

[1] Like the Court, the Debtor and Hamilton are keenly aware that FRS asserts an interest in the Portfolio and its proceeds, yet neither the Settlement Motion nor the Dismissal Motion even <u>mention</u> the contested issue.  They would prefer to divvy up the money between them, without affording FRS an opportunity to have its rights adjudicated by the Court.

Hamilton is the investment vehicle for Exigent Alternative Capital LLC ("**Exigent**"), a hedge fund based in Jerusalem, Israel.  On December 22, 2016, just three (3) days after FRS filed pleadings in Argon's bankruptcy case reciting the wrongful sale of loan collateral to the Debtor, Exigent terminated its registration with the SEC.  See **Exhibit B** to this Objection.  If this Court approves the settlement and permits disbursement of the cash proceeds to Hamilton/Exigent, nothing will stop them from removing themselves from the jurisdiction of the courts of the United States.

FRS requests due process, a full and fair opportunity to prove its superior rights to the loan portfolio.  The Court may recall that there were two key issues that were raised at the March 1, 2017 hearing in this case:  (1) whether FRS has a perfected security interest in the loans in the Debtor's portfolio, and (2) whether Hamilton is a *bona fide* purchaser of the loans.  The Court stated that, whether by contested matter or adversary proceeding, it would allow FRS an opportunity to prove its interest in the loans and refute Hamilton's BFP defense.  With that pronouecment fresh in mind, Hamilton and the Debtor have negotiated a settlement designed to cut off FRS's rights before FRS can be heard.  They seek to deprive FRS of any venue in which the parties' competing interests in the portfolio will be determined.

As a procedural matter, this Court noted during the March 1, 2017 hearing that Argon – the entity that had pledged the loans to FRS and then sold them to the Debtor – was then itself a debtor in a pending Chapter 7 bankruptcy in the Northern District of Illinois (Case No. 16-39654 (DLT)).  Therefore, the Court requested that FRS obtain stay relief, since the Court may implicate Argon's rights.  FRS sought stay relief from the Argon bankruptcy court, but as a result of the resignation of Argon's chapter 7 trustee due to a conflict of interest, a full hearing on the stay relief motion has been adjourned pending appointment of a permanent Chapter 7 trustee.  In

3

response to FRS's stay relief motion, certain Argon equity holders and management have stated that Argon retained an interest in the Spartan loan portfolio, and if true, the automatic stay would prohibit this Court from adjudicating the Motions, as they necessarily include a determination of the priority of the parties' competing interests.  Argon's Executive Vice President of Finance, Eric Schnosenberg, testified in the Argon bankruptcy case that Argon retained an interest in the Spartan loan portfolio and accounted for it on its financial statements.  In order to protect FRS's security interest in the loan collateral, FRS was granted limited stay relief for purposes of filing this objection.  See **Exhibit C** to this Objection.

If this Court nevertheless determines to proceed with determination the Motions on the merits, the Court should consider that neither the Debtor nor Hamilton is an unwitting, innocent party in this matter.  The parties knew that the source of the Debtor's proposed loan portfolio was Argon Credit, LLC.  Barry Kostiner knew the loans the Debtor acquired had been pledged as collateral to Argon's lender (FRS's predecessor in interest, Princeton Alternative Income Fund ("**Princeton**")), since Mr. Kostiner was Argon's Vice President of Capital Markets.  Hamilton knew the loans already had been pledged to Argon's lender because Hamilton used Princeton's loan documents as a model for its own loan to the Debtor and produced "redlined and clean [documents] off the Princeton doc," which it transmitted to the Debtor for their mutual use.  See **Exhibit D** to this Objection.

For these reasons and the reasons more fully set forth herein, the Motions should be denied, without prejudice, until stay relief permitting trial on the merits is obtained and FRS has an opportunity to prove  its superior right to the loans and their proceeds.

## FACTUAL BACKGROUND

**Argon X Borrows from Fintech Financial LLC**

1.        Argon X LLC ("**Argon X**"), a Delaware limited liability company, is an originator and servicer of consumer loans.

2.        Pursuant to that certain Master Consumer Loan Purchase Agreement, on May 1, 2015 (the "**Master Agreement**"), Argon X agreed to purchase consumer loans originated by Argon X's parent company, Argon Credit LLC ("**Argon Credit**"), and Argon Credit's subsidiary entities (collectively, the "**Argon Credit Subsidiaries**").[2]   See FRS's Response to Debtor's Motion to Use Cash Collateral and Cross-Motion to Prohibit Use of Cash Collateral [Dkt. No. 40] ("**FRS Response**"), Exh. A.   Pursuant to the Master Agreement, Argon X acquired the exclusive right to all payments made on account of consumer loans it acquired from Argon Credit or the Argon Credit Subsidiaries.

3.        On May 1, 2015, Fintech Financial LLC ("**Fintech**"),[3] as lender, and Argon X, as borrower, entered into a Loan and Security Agreement (the "**LSA**") pursuant to which Fintech established a revolving credit facility for Argon X in the original principal amount of up to $20 million (collectively, the "**Argon Loans**").   See FRS Response, Exh. C.   The LSA was later amended to increase the credit facility to up to $37,500,000.

4.        Argon X's obligation to repay the Argon Loans was evidenced by a Revolving Loan Note dated May 1, 2015.  See FRS Response, Exh. D.

---

[2] The Argon Credit Subsidiaries include Argon Credit of Alabama LLC, Argon Credit of California, Argon Credit of Louisiana, Argon Credit of Georgia, Argon Credit of Utah ; and Argon Credit of Illinois.

[3]   Fintech Financial LLC, the lender to Argon X, must be distinguished from Fintech Asset Management LLC, the sole member of the Debtor.  Although the names are strikingly similar, FRS is unaware of any affiliation or common ownership between the companies.  Barry Kostiner, the sole member of Fintech Asset Management LLC, was undoubtedly aware of the existence of Fintech Financial LLC, since Mr. Kostiner was formerly employed by Argon as its Vice President of Capital Markets.

5.      Argon Credit and Argon X commenced a Chapter 11 bankruptcy case (Case No. 16-39654) in the United States Bankruptcy Court for the Northern District of Illinois (the "**Argon Court**") on December 16, 2016.  As of the date of Argon's bankruptcy filing, the debtors owed Princeton at least $37,291,193.98.

6.      To secure repayment of the Revolving Loan Note, Argon X granted Fintech a security interest in, and lien upon, all of Argon's personal and real property, whether then owned or thereafter acquired or existing and wherever located (collectively, the "**Collateral**"). LSA, Section 5.1.  The Collateral in which Fintech obtained a security interest includes, without limitation, (i) all of Argon X's consumer loan receivables then owned or thereafter originated or acquired by Argon, and all amounts due and to become due thereunder (the "**Receivables**"); (ii) all payments received on or with respect to the Receivables, including all payments of principal, interest and other fees paid by Account Parties (as defined in the LSA) pursuant to the Contracts or otherwise collected or received in respect of the Receivables (the "**Collections**"); (iii) all instruments, including without limitation, all promissory notes and any other instruments related to the Receivables, whether in tangible or electronic form; (iv) all Accounts, including without limitation the Accounts related to the Receivables; (v) all Contract Files; and (vi) all of the Pledged Accounts and all other monies, credit balances, deposits and other property of [Argon X] then or thereafter held or received by or in transit.  *Id.*

7.      Argon X's obligations under the LSA were guaranteed by Argon Credit and each of the Argon Credit Subsidiaries.  To secure their guaranty, Argon Credit and each of the Argon Credit Subsidiaries granted to Fintech "a security interest in all consumer loans and related contracts, contract files, accounts, receivables and other rights that such Guarantor may from time to time assign and transfer directly or indirectly to [Argon X] pursuant to assignments or

similar documents of transfer, and all proceeds thereof . . ."  To perfect its security interest

therein, Fintech duly filed UCC financing statements against Argon Credit and Argon Credit

Subsidiaries.  See FRS Response, Exh. G.

**Fintech Assigns Loan Portfolio to Princeton Alternative Income Fund, LP**

8.      On May 6, 2015, Fintech, as seller, and Princeton Alternative Income Fund LP

("**Princeton**"), as buyer, entered into a Master Assignment of Loans, pursuant to which Fintech

sold, transferred and assigned to Princeton all of Fintech's right, title and interest in and to the

Argon Loans, together with and including all of Fintech's rights and remedies under the LSA

and its interest in the Collateral, including the Receivables and Collections of loans originated

by Argon Credit and the Argon Credit Subsidiaries.  See FRS Response, Exh. H.

9.      Princeton filed UCC financing statements assigning all of Fintech's rights in the

Collateral to Princeton.  See FRS Response, Exh. I.

**Princeton Assigns Loan and Rights in LSA and Collateral to FRS**

10.     On or about December 7, 2016, Princeton assigned all of its right, title and

interest in the Argon Loan, including all right, title and interest in the LSA, all other Financing

Agreements, and the Collateral to FRS.  *See* FRS Response, Exh. J.  FRS filed UCC financing

statements assigning all of Princeton's rights in the Collateral to FRS.

**Argon Credit Fraudulently Resells Loans Previously Pledged to FRS to Spartan**

11.     Upon information and belief, Spartan was formed for the purpose of acquiring and

servicing a portfolio of loans made by third party marketplace lenders (the "**Portfolio**").

12.     Beginning in or about November 2015, Spartan began purchasing loans from

Argon Credit, which loans comprise all or substantially all of the Debtor's Portfolio.

13.     However, as set forth above, in order to secure Argon X's obligations under the LSA, all right, title and interest in the loans originated by Argon Credit and the Argon Credit Subsidiaries, the Receivables, and the Collections were previously pledged as collateral to FRS.

14.     Upon information and belief, 1,158 loans that had been financed by FRS and in which FRS holds a first priority security interest were sold to Spartan.  According to the Settlement Motion, however, only 990 loans remain in the current Portfolio.

15.     Upon information and belief, Spartan financed the purchase of loans for the Portfolio, including loans originated by Argon Credit and the Argon Credit Subsidiaries, by, among other things, borrowing from Hamilton.

16.     To secure its indebtedness to Hamilton, Spartan pledged the loans that it had acquired from Argon Credit as collateral for the Hamilton financing.

17.     Argon Credit and the Argon Credit Subsidiaries had no authority to sell the loans to Spartan because the loans had already been pledged to FRS.

18.     FRS has a duly-perfected, first priority security interest in and to the Receivables and Collections from the loans originated by Argon Credit and the Argon Credit Subsidiaries.

19.     Any Collections from the Argon Credit loans that were pledged to FRS are not property of the Debtor's estate, since FRS has a duly-perfected first priority security interest in the loans and the Collections.

**Spartan's Bankruptcy Filing**

20.     On June 29, 2016 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, §§ 101, et seq., as amended (the "**Bankruptcy Code**") in this Court.

8

21.    The Debtor declared that the reason for its bankruptcy filing was Hamilton's improper declaration of an event of default under the Spartan loan documents, and swept at least $705,000 (and as much as $1.5 million[4]) from the Spartan's bank account immediately before the Petition Date, which "caused a complete collapse of Spartan's operations."[5]  The Debtor stated that it not only has defenses to the alleged default, but affirmative claims against Hamilton for fraud, fraud in the inducement, violation of state and federal lending laws,[6] bad faith, and willful breach of contract.[7]

**The Cash Collateral Motion**

22.    On July 5, 2016, the Debtor filed a motion for authority to use Hamilton's cash collateral.

23.    Hamilton opposed the Debtor's use of cash collateral and asserted a secured claim in the amount of $3,045,621.19.

24.    By Order dated July 22, 2016, this Court authorized the Debtor's interim use of $7,500 per month in cash collateral [D.I. 27], and such interim use has been extended from time to time upon the same terms.

25.    FRS filed an objection and cross-motion to prohibit the Debtor's use of cash collateral.   [D.I. 40]

26.    This Court held a hearing on the Debtor's motion and FRS's cross-motion on March 1, 2017.  At the hearing, the Court stated that FRS would be afforded an opportunity to prove that it holds a first priority interest in the Portfolio and that Hamilton is not a *bona fide* purchaser for value.

---

[4] See Debtor's Motion for Use of Cash Collateral, Dkt. 8, fn.4.
[5] See Declaration of Barry J. Kostiner, Dkt. 19, ¶ 43.
[6] See Debtor's Motion for Use of Cash Collateral, Dkt. 8, ¶ 34.
[7] See Declaration of Barry J. Kostiner, Dkt. 19, ¶ 34.

27.     The Court further stated its concern that the automatic stay arising in the Argon Credit and Argon X bankruptcy cases may prohibit this Court from determining the parties' respective rights in the Portfolio.  Therefore, this Court requested that FRS seek stay relief from the Argon Court, which FRS did.

28.     Shortly after FRS filed a stay relief motion, Argon's Chapter 7 trustee determined that she had a conflict of interest that required her resignation.  An interim Chapter 7 trustee has been appointed in her stead.  The interim trustee and certain equity holders of Argon filed motions seeking additional time to review the stay relief request and to ascertain what, if any, interest Argon retained in the loans that are now included in Spartan's Portfolio.  The Argon Court granted the trustee and equity holders' extension motions and simultaneously granted FRS limited stay relief for purposes of filing this Objection.  See Exhibit C hereto.

29.     Argon's Executive Vice President of Finance, Eric Schnosenberg, testified in the Argon Court that Argon retained an interest in the Spartan loan portfolio and accounted for it on its financial statements.

> Q:   So go to Exhibit 3, and if you can walk the court through, does anywhere show Argon's ownership in the SSF –
>
> A:   It does.  If you flip to the first page of the memorandum of understanding, it shows the GP equity split.  As you can see, there's a percentage for Argon Management of 31 percent, and then SSF Holdings, you'd have Margon, Little Owl, FTAM [Fintech Asset Management, owned by Barry Kostiner], and then an employee incentive pool for Argon.
>
> Q:   And what is the percentage owned by Argon?
>
> A:   That would be 41 percent.

1/6/2017 Schnosenberg Tr. 149:11-22  (annexed to this Objection as **Exhibit E**).

> Q:   And did [Argon's auditors] explain to you why [Spartan's loan portfolio was consolidated into Argon's financial statements]?

10

A:   Because we retained an ownership interest of those assets.  Argon retained an
ownership of those assets, so they wanted us to continue to monitor those
collections on those assets.

1/6/17 Schnosenberg Tr. 151:15-19 (annexed to this Objection at **Exhibit E**).

30.    In apparent agreement with this Court, the Argon Court has also opined that, if

Argon retained an interest in the Portfolio, the automatic stay would enjoin this Court from taking

any action with regard to that asset.  This injunction would include this Court making the findings

that the Debtor and Hamilton seek in the Motions, such as the determination that Hamilton holds:

a valid, binding, enforceable, and perfected first-priority lien upon and against all
assets of the Debtor, including any cash and cash proceeds generated by any of its
assets and are not subject to avoidance, recharacterization, or subordination
pursuant to the Bankruptcy Code or applicable non-bankruptcy law except with
respect to valuation of the collateral under Section 506(a) of the Bankruptcy Code.

These issues have been put squarely into dispute by FRS (and may soon be joined by Argon's

permanent chapter 7 trustee).

**The Settlement Motion**

31.    The Debtor and Hamilton have agreed to resolve the cash collateral motion and, in

connection therewith, fix the allowed amount of Hamilton's secured claim.  In summary, the

terms of the agreement are:

(a)    Hamilton's claim will be deemed to have a first priority allowed as
a secured claim in the amount of $3,045,621.19 – the full amount
asserted by Hamilton – which will accrue interest at 20% per
annum;

(b)    Hamilton will receive a general release immediately upon approval
of the agreement;

(c)    Hamilton will be paid $1,000,000 within 2 days after approval of
the settlement by this Court;

(d)    Spartan will pay Hamilton's lawyers $125,000 within 30 days after
approval of the settlement;

(e)     The Debtor's principal, Barry Kostiner, will receive a release of his personal guaranty upon making the aforesaid payments to Hamilton and its counsel.

(e)     Spartan's current servicing company will be replaced by one chosen by Hamilton, and the costs of de-boarding and re-boarding the loans will be borne by Spartan;

(f)     Hamilton will accept $1,400,000 in satisfaction of its remaining $2,045,621.19 claim if paid within 15 months after approval of the stipulation;

(g)     Spartan's permitted use of cash collateral will increase from $7,500 per month to $10,000 per month for a period of 6 months after approval of the stipulation.  If Spartan pays at least $500,000 to Hamilton within 6 months, it may continue to use $10,000/mo. in cash collateral for an additional 6 months.  If during that 6 month period, Spartan pays at least $500,000 to Hamilton, Spartan may continue to use $10,000 per month for another 3 months.  If Spartan pays an additional $400,000 to Hamilton within that 3 month period, Spartan may use cash collateral without seeking Hamilton's consent or approval.

(h)     Spartan is required to move for dismissal of its bankruptcy case.

32.     Hamilton and the Debtor buried deep within the Stipulation a paragraph that masquerades as an order of this Court.  Paragraph 13 of the Stipulation prohibits this Court from entering any order that supersedes or conflicts with "this Order," and in the event of a conflict, "this Order" shall control.   This paragraph of the Stipulation would be triggered, perhaps unwittingly, if the Court approved the Stipulation "in all respects," as requested by the Debtor and Hamilton.

**The Dismissal Motion**

33.     In accordance with the Stipulation, the Debtor has filed a motion to dismiss its bankruptcy case upon terms.  If granted, the Debtor's case would be dismissed with instructions for Hamilton to use the proceeds of the Portfolio to pay up to $135,000 to the Debtor's counsel (on consent of Hamilton, but without Court approval), all U.S. Trustee quarterly fees, and a 35%

12

distribution to non-insider general unsecured creditors.  After dismissal, Spartan will be permitted to use the proceeds of the Portfolio to pay Hamilton and, upon satisfaction of Hamilton's claim, for whatever purpose it desires – all without regard to FRS's or the Argon debtors' rights in the Portfolio.

34.      FRS objects to the Settlement Motion and Dismissal Motion because the loans in the Portfolio constitute FRS's collateral for loans made to Argon X, and the Debtor and Hamilton seek to foreclose FRS's ability to assert its rights in that collateral.  Both the Debtor and Hamilton were clearly aware of the security interest, since the loan documentation for Hamilton's financing of Spartan was redlined by Hamilton against the "Princeton" loan documents.  If approved, the proceeds of FRS's collateral will be irretrievably disbursed to Hamilton, Hamilton's counsel, Spartan, Spartan's counsel, Spartan's creditors and others.  The loan proceeds should to be held in escrow pending adjudication of the parties' rights and priority in the Portfolio and its proceeds.

## ARGUMENT

### I.      The Debtor's Motion to Approve the Stipulation Should Be Denied.

35.      Bankruptcy Rule 9019(a) provides, in relevant part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  Fed. R. Bankr. P. 9019(a). As a general matter, "[s]ettlements and compromises are favored in bankruptcy as they minimize costly litigation and further parties' interests in expediting the administration of the bankruptcy estate."  *In re Dewey & LeBoeuf LLP*, 478 B.R. 627, 641-642 (Bankr. S.D.N.Y. 2012) (quoting *In re MF Global Inc.*, No. 11-2790, 2012 Bankr. LEXIS 3701, 2012 WL 3242533, at *5 (Bankr. S.D.N.Y Aug. 10, 2012); see *Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 455 (2d Cir. 2007) (stating

that settlements are important in bankruptcy because they "help clear a path for the efficient administration of the bankrupt estate").

36.    A court must determine that a settlement under Bankruptcy Rule 9019 is fair, equitable, and in the best interests of the estate before approving it.  *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-25, 88 S. Ct. 1157, 20 L. Ed. 2d 1 (1968); *Air Line Pilots Assoc. v. Am. Nat'l Bank & Trust Co. of Chi. (In re Ionosphere Clubs, Inc.)*, 156 B.R. 414, 426 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994). In so doing, the Court should "be apprised of those facts that are necessary to enable it to evaluate the settlement and to make a considered and independent judgment." *In re Adelphia Commc'ns Corp.*, 327 B.R. 143, 159 (Bankr. S.D.N.Y. 2005).

37.    The decision to approve or deny a particular settlement involving a bankruptcy estate lies within the discretion of the bankruptcy court.  *Vaughn v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991).

38.    In the Second Circuit, *Iridium* directs courts to balance seven interrelated factors in determining whether a settlement is fair and equitable.  Those factors are:

(1)    the balance between the litigation's possibility of success and the settlement's future benefits;

(2)    the likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay, including the difficulty in collecting on the judgment;

(3)    the paramount interests of the creditors, including each affected class's relative benefits and the degree to which creditors either do not object to or affirmatively support the proposed settlement;

(4)    whether other parties in interest support the settlement;

(5)    the competency and experience of counsel supporting, and the experience and knowledge of the bankruptcy court judge reviewing, the settlement;

14

     (6)     the nature and breadth of releases to be obtained by officers and directors;

     (7)     the extent to which the settlement is the product of arm's length bargaining.

*Iridium*, 478 F.3d at 462.

39.     The *Iridium* factors weigh against approval of the Stipulation. First, the Debtor stated in its cash collateral motion and supporting certification that the Debtor was forced to file this bankruptcy proceeding because Hamilton had wrongfully declared a default under its loan documents and, in an exercise of self-help, improperly swept at least $705,000 and perhaps as much as $1,500,000 from Spartan's bank accounts. Hamilton had "caused a complete collapse of Spartan's operations."[8] As a result of Hamilton's conduct, the Debtor has affirmative claims against Hamilton for fraud, fraud in the inducement, violation of state and federal lending laws,[9] bad faith, and willful breach of contract.[10]

40.     The Stipulation represents the Debtor's complete and unmitigated capitulation to Hamilton. Immediately upon approval of the Stipulation, the Debtor will grant Hamilton a general release from any and all claims it has against Hamilton. Hamilton's claim will be allowed in the full amount asserted by Hamilton ($3,045,621.19). Hamilton's claim will accrue interest at 20%, the same rate provided under Hamilton's loan documents. Hamilton's claim will be deemed fully secured, with

> a valid, binding, enforceable, and perfected first-priority lien upon and against all assets of the Debtor, including any cash and cash proceeds generated by any of its assets and are not subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law except with respect to valuation of the collateral under Section 506(a) of the Bankruptcy Code.

---

[8] See Declaration of Barry J. Kostiner, Dkt. 19, ¶ 43.
[9] See Debtor's Motion for Use of Cash Collateral, Dkt. 8, ¶ 34.
[10] See Declaration of Barry J. Kostiner, Dkt. 19, ¶ 34.

Hamilton will receive $1,000,000 immediately on approval of the Stipulation and its lawyers will receive $125,000 within 30 days. Hamilton's claim will be deemed satisfied if the Debtor pays an additional $1,400,000 to Hamilton within 15 months. Thus, Hamilton will be repaid the full amount of its loan, at 20% interest, but if repayment is made within 15 months, Hamilton will waive the "non-use" fee, which is a fee Hamilton charged Spartan for *not borrowing enough* money from Hamilton. Hamilton's lawyers get paid $125,000 within 30 days.

41.    In exchange, Hamilton will consent to the Debtor increasing its monthly cash collateral usage from $7,500 to $10,000 for just 6 months. If the Debtor behaves and obtains its extensions, the Debtor will have paid Hamilton $2,400,000 over 15 months, and in return, had use of just $150,000 in cash collateral. If existing cash collateral orders remain in effect, this Court would permitted the Debtor use of $112,500 without Hamilton's consent. Hamilton's "increase" in cash collateral usage is *de minimis*, particularly when compared to the benefits Hamilton took for itself. Hamilton will review the invoices of Debtor's counsel and may consent to pay the lawyers up to $135,000. The Stipulation does not even cap Hamilton's claim, as any expenses Hamilton incurs in connection with FRS and Argon are excluded from Hamilton's release of the Debtors.

42.    The Debtor cannot in good faith describe these terms as a "settlement," as no reasonable debtor would agree to such one-sided terms. In this case, the Debtor made its "deal with the devil" because it affords a general release to its principal, Barry Kostiner, based on payments that are already on deposit with the Debtor. What consideration did Mr. Kostiner give in exchange for his release? The *Debtors* gave plenty of consideration by capitulating to Hamilton on every issue.

43.    The Stipulation is manifestly unfair to FRS.  By design, the Stipulation will declare Hamilton's rights in the Portfolio and deprive FRS of the opportunity to prove its superior interest therein.  If the Debtor's case is dismissed, FRS may be denied a venue in which to enforce its rights.

44.    At the March 1, 2017 hearing, this Court and the parties noted that there were two substantive issues that would need to be determined by the Court: (1) the scope of FRS's security interest in Argon Credit's assets and (2) whether Hamilton is a *bona fide* purchaser (BFP).  As to the latter, Hamilton is not a BFP due to its actual knowledge of Princeton's security interest, having used Princeton's documents as a model for its own.  See Exh. D.

45.    As to its security interest, FRS submits that the evidence will show that substantially all of loans in the Portfolio were funded by FRS and, pursuant to the Master Agreement and related documents, were assigned by Argon Credit to Argon X.  The loans were subject to FRS's blanket security interest in all assets of Argon X.

46.    If the loans were not assigned to Argon X and remained with Argon Credit, Argon Credit guaranteed the Argon X's obligations under the LSA.  To secure its guaranty, Argon Credit granted to Fintech (FRS's predecessor in interest) "a security interest in all consumer loans and related contracts, contract files, accounts, receivables and other rights that such Guarantor may from time to time assign and transfer directly or indirectly to [Argon X] pursuant to assignments or similar documents of transfer, and all proceeds thereof . . ."  This security interest was perfected through a UCC filing.  FRS Response, Exh. G.

47.    At the March 1, 2017 hearing, Hamilton argued that, under the Guaranty, Argon Credit granted FRS a security interest in the loans that Argon Credit assigned and transferred to Argon X and its proceeds.  Hamilton is wrong for several reasons.

17

48.     First, Hamilton's interpretation of the Guaranty is nonsensical, as Argon Credit cannot grant a security interest in loans that it does not own, since they were assigned to Argon X.  *Duane Reade, Inc. v. Cardtronics, LP*, 54 A.D.3d 137, 143-44, 863 N.Y.S.2d 14, 19 (N.Y. App. Div. 1st Dep't 2008) (a contract should not be construed "disregarding common sense in favor of formalistic literalism" that defies logic); *Greenwich Cap. Fin. Prods., Inc. v. Negrin*, 74 A.D.3d 413, 415, 903 N.Y.S.2d 346, 348 (N.Y. App. Div. 1st Dep't 2010) ("[A] contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties."); *SR Int'l Bus. Ins. Co. v. Allianz Ins. Co., L.L.C.*, 343 Fed. App'x 629, 632 (2d Cir. 2009) ("The meaning of particular language . . . should be examined in light of the business purposes sought to be achieved by the parties and the plain meaning of the words chosen by them to effect those purposes.").

49.     Second, Hamilton's interpretation violates the doctrine of the last antecedent. This rule is the legal expression of a commonsense principle of grammar that a backward-looking or forward-looking pronoun should be placed as near as the construction allows to the noun or noun phrase to which it refers.  In the "seminal authority" on the doctrine of the last antecedent, *Barnhart v. Thomas,* 540 U.S. 20, 27-28 (2003), the Supreme Court of the United States illustrated how the rule works.

50.     The Supreme Court posited a situation in which parents warned a teenage son, "You will be punished if you throw a party or engage in any other activity that damages the house."  In its unanimous opinion, the Court said, "If the son nevertheless throws a party and is caught, he should hardly avoid punishment by arguing that the house was not damaged."  *Id.* at 27.  The relative pronoun *that* attaches only to *other activity*, not to *party* as well.

51.     Similarly, in this case, the relative pronoun *that* attaches to *other rights* and not to the preceding items in the list (i.e., consumer loans and related contracts, contract files, accounts, and receivables).  If that modifying clause had been set aside by commas (like the clause *, and all proceeds thereof,*) it could be read to apply to all the previous antecedents.  The absence of commas indicates it applies only to *other rights*.

52.     This interpretation also makes common sense, since the other items of collateral (loans, contract files, accounts, receivables) all have easily understood meanings, but the term *other rights* is so generic that it needs a description to give it meaning.

53.     While FRS appreciates that resolution of a contested cash collateral motion may be attractive, the Court must look at the entire bargain that was struck.  Under the Stipulation, the Debtor fully surrenders to Hamilton.  As a result, millions of dollars in loan proceeds – FRS's money – will be disbursed to all constituencies *except* FRS.  And if the Debtor's bankruptcy case is dismissed, FRS may well have no venue in which to adjudicate its rights. Undoubtedly, Hamilton and the Debtor would use the Court-approved Stipulation (which, among other things, declares Hamilton's first priority lien in the Portfolio) to preclude this or any other court from subsequently declaring FRS to have superior rights to Hamilton in the Portfolio.  Therefore, the Debtor's motion to approve the Stipulation should be denied.

## II.     The Dismissal Motion Should Be Denied.

54.      Section 1112(b) provides that "on request of a party in interest after notice and a hearing, the court shall convert … or dismiss a case under [Chapter 11], whichever is in the best interests of creditors and the estate, for cause … " 11 U.S.C. § 1112(b)(1).

55.     The moving party bears the burden to establish "cause" under section 1112(b). *In re Adbrite Corp.*, 290 B.R. 209, 214 (Bankr. S.D.N.Y. 2003); *In re Pulp Finish 1 Co.*, 2013

Bankr. LEXIS 4139, 2013 WL 5487933, at *2 (Bankr. S.D.N.Y. Oct. 2, 2013).  The bankruptcy court has wide discretion to determine if cause exists and how to ultimately adjudicate the case. *In re State St. Assocs., L.P.* 348 B.R. 627, 638 (Bankr. N.D.N.Y. 2006). Even if a court finds that "cause" exists, the court is not obliged to dismiss the case, as the decision remains within its broad discretion.  *In re 1031 Tax Group, LLC*, 374 B.R. 78, 93 (Bankr. S.D.N.Y. 2007).

56.    Here, the Debtor seeks a structured dismissal that will pay Hamilton in full, provide for payment of U.S. Trustee quarterly fees, up to $135,000 to the Debtor's counsel, and make a 35% distribution to non-insider general unsecured creditors.  The centerpiece of the requested structured dismissals would be the survival of the Stipulation despite dismissal of the Debtor's case.

57.    The Dismissal Motion should be denied.  The Bankruptcy Code contemplates in Sections 305 and 1112 that a chapter 11 bankruptcy case may be resolved by dismissal, but provides in Section 349 that the effect of such a dismissal will be to restore the parties to the *status quo ante* as if the bankruptcy was never filed, unless the bankruptcy court "for cause, orders otherwise."  The Debtor has not demonstrated "cause" to deviate from the outcome established by Section 349.

58.    For all the reasons set forth above, it is clear that dismissal is sought for an improper purpose:  to deny FRS the opportunity and the forum in which to have its rights in the Portfolio declared and enforced by this Court.  Hamilton and the Debtor are clearly hoping that the Court will be cajoled into approving dismissal because administrative claims will be paid, and "some" distribution is made to unsecured creditors.  Of course, the Debtor provides no information about how it determined to make a 35% distribution to non-insider unsecured creditors and how creditors would fare upon liquidation.  Such information would typically be

found in a disclosure statement, and the omission suggests manipulation of the outcome by Hamilton and the Debtor.  Therefore, the Dismissal Motion should be denied, so that FRS may have the opportunity to demonstrate and enforce its rights in the Portfolio and, most importantly, maintain access to this forum in which to do so.

WHEREFORE, FRS respectfully requests that this Honorable Court deny the Settlement Motion and the Dismissal Motion, and grant FRS such other relief as this Court deems just and appropriate.

Respectfully submitted,

SILLS CUMMIS & GROSS, P.C.

Date:  May 12, 2017                    By: */s/ Valerie A. Hamilton*
                                            Valerie A. Hamilton, Esq.
                                            600 College Road East
                                            Princeton, NJ 17110
                                            (609) 227-4600
                                            vhamilton@sillscummis.com

                                            *Attorneys for Fund Recovery Services, LLC*